USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _____5/28/15_____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x

MARC SCHILLER,                              :        **MEMORANDUM DECISION**
                Plaintiff,

                              :        14cv2824-ALC-FM

        -against-

                              :

VIACOM, INC., et al.,
                Defendants.         :

----------------------------------------------------------x

**FRANK MAAS**, United States Magistrate Judge.

        Plaintiff Marc Schiller ("Schiller") brings this action sounding in defamation and violation of privacy against Viacom, Inc. ("Viacom"), Paramount Pictures Corporation ("Paramount"), Paramount Home Entertainment, Inc. ("Paramount Home"), De Line Pictures, Inc. ("De Line Pictures"), General Nutrition Corporation ("GNC"), GNC Holdings, Inc., Nutra Manufacturing, Inc., Michael Bay, Donald De Line, Ian Bryce, Christopher Markus ("Markus"), Stephen McFeeley ("McFeeley"), and Mark Wahlberg (collectively, the "Defendants"). Schiller's claims stem from the allegedly defamatory and unauthorized portrayal of him in the 2013 motion picture "Pain and Gain" (the "Film"). The Defendants have moved, pursuant to 28 U.S.C. § 1404(a), to transfer venue to the Southern District of Florida. Schiller opposes the motion and prefers to litigate in this District. For the reasons set forth below, the Defendants' motion is granted.[1]

---

[1]      Pursuant to 28 U.S.C. § 636(b)(1)(A), a magistrate judge may determine non-
(continued...)

I.      Facts[2]

Since 2011, Schiller has lived in Florida, where he also works.  (Schiller Decl. ¶ 7; Schiller Decl. II ¶ 4; Cox Decl. ¶ 17; ECF No. 63 ("Defs.' Mem.") at 10, 12, 18; ECF No. 72 ("Pl.'s Opp.") at 10-11).  Prior to that time, he had lived in Miami, Florida, between 1990 and 1994.  (Schiller Decl. ¶¶ 5-6).  In 1999 a journalist named Pete Collins ("Collins") published a three-part article in the Miami New Times titled "Pain and Gain" (the "Article").  The Article chronicled the criminal activities of the "Sun Gym Gang," a group of violent felons operating out of the Sun Gym in Miami in the early 1990s.  (Collins Decl. ¶ 2; id. Ex. 1).  "Almost all" of the sources Collins interviewed for the Article resided in South Florida.  (Id. ¶ 3).  In part, the Article detailed the 1994 kidnapping, torture, and extortion of Schiller at the hands of the Sun Gym Gang.  (See id. Ex. A; Am. Compl. ¶¶ 34-37).

---

[1] (...continued)
case-dispositive matters.  An order transferring venue under 28 U.S.C. § 1404(a) is considered non-dispositive.  See Shenker v. Murasky, No. 95 CV 4692 (NG) (RML), 1996 WL 650974, at *1 (E.D.N.Y. Nov. 6, 1996) (citing Michelli v. City of Hope, No. 93 Civ. 7582 (KMW) (THK), 1994 WL 410964, at *6 n.1 (S.D.N.Y. Aug. 4, 1994)).

[2]       The following facts are derived from the amended complaint (ECF No. 36 ("Am. Compl." or "Amended Complaint")), the sworn declarations of Ralph Bertelle (ECF No. 64 ("Bertelle Decl.")), Pete Collins (ECF No. 65 ("Collins Decl.")), Vincent Cox (ECF No. 66 ("Cox Decl.")), Christopher Markus (ECF No. 67 ("Markus Decl.")), Stephen McFeely (ECF No. 68 ("McFeely Decl")), Patrick McKenna (ECF No. 69 ("McKenna Decl.")), Justin Moore (ECF No. 70 ("Moore Decl.")), Marguerite Pacacha (ECF No. 71 ("Pacacha Decl.")), Karen Magid (ECF No. 79 ("Magid Decl.")), Holly Ostrov Ronai (ECF No. 73 ("Ronai Decl.")), and Marc Schiller (ECF Nos. 74 ("Schiller Decl."), 77 ("Schiller Decl. II")), and the exhibits annexed thereto.

Collins assigned the motion picture rights to the Article to Paramount, (Collins Decl. ¶ 4), a Delaware corporation headquartered in California, (Bertelle Decl. ¶ 3).[3]  Subsequently, Paramount partnered with De Line Pictures to produce the Film, also named "Pain and Gain," for which Collins served as a consultant.  (Id. ¶¶ 5, 10).  Markus and McFeely wrote the screenplay for the Film, which was based in part on Collins' Article, in California.  (Markus Decl. ¶¶ 3, 6-7; McFeely Decl. ¶¶ 3, 6-7).  Pre-production for the Film took place in South Florida and California, the Film was "prepped" in South Florida, and the Film was shot on location in South Florida over the course of forty-two days.  (Bertelle Decl. ¶ 6).  Following the Film's release, Paramount Home, a wholly-owned subsidiary of Paramount, and GNC, a Delaware corporation with its principal place of business in Pennsylvania, participated in a joint promotional campaign involving DVDs of the Film and certain GNC nutritional supplements.  (Moore Decl. ¶ 4).

On April 21, 2014, Schiller commenced this action against the Defendants, claiming that his portrayal in the film was "untrue and demonizing," and therefore defamatory, because the Film was characterized and promoted as a "true story."  (Ronai Decl. ¶ 3; see Am. Compl. ¶¶ 198-270).  Schiller also alleged that his right to privacy was violated through the unauthorized use of his likeness in the Film and in various products associated with the Film.  (Ronai Decl. ¶ 3; Am. Compl. ¶¶ 271-343).

---

[3]    The parties disagree as to whether Paramount's and Paramount Home's primary place of business is New York or California.  (See Defs.' Mem. at 8; Pl.'s Opp. at 10).  Although that fact issue is not irrelevant, as set forth below, it is not dispositive.

II.    Discussion

    A.    Section 1404(a)

        Section 1404(a) provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."  28 U.S.C. § 1404(a). Therefore, to prevail on a motion to transfer, the movant bears the burden of establishing: first, that the proposed transferee district is one where the lawsuit "might have been brought;" and second, that the transfer will serve the convenience of the parties and the witnesses and the interests of justice.  Price v. Stossel, No. 07 Cv. 11364 (SWK), 2008 WL 2434137, at *2 (S.D.N.Y. June 4, 2008) (citing Fuji Photo Film Co. v. Lexar Media, Inc., 415 F. Supp. 2d 370, 373 (S.D.N.Y. 2006)); Indian Harbor Ins. Co. v. Factory Mut. Ins. Co., 419 F. Supp. 2d 395, 401 (S.D.N.Y. 2005) (collecting cases).

        An action may properly be brought in a forum "if, at the time the action was originally filed, the transferee court would have had subject matter jurisdiction and personal jurisdiction over the defendants, and if venue would have been proper in the transferee court."  Indian Harbor Ins. Co., 419 F. Supp. 2d at 401 n.1 (quoting Posven, C.A. v. Liberty Mut. Ins. Co., 303 F. Supp. 2d 391, 401 (S.D.N.Y. 2004)).

        Once the moving party has established that an action could have been brought in the district to which transfer is sought, the factors that the court should consider in deciding whether to grant a § 1404(a) transfer include:

> (1) the convenience of witnesses; (2) the location of relevant
> documents and relative ease of access to sources of proof; (3)
> the convenience of the parties; (4) the locus of operative facts;
> (5) the availability of process to compel the attendance of
> unwilling witnesses; (6) the relative means of the parties; (7)
> the forum's familiarity with the governing law; (8) the weight
> accorded the plaintiff's choice of forum; and (9) trial
> efficiency and the interest of justice, based on the totality of
> the circumstances.

Izkhakov v. Educ. Comm'n for Foreign Med. Graduates, No. 12 Civ. 348 (ALC), 2012 WL 2861338, at *3 (S.D.N.Y. July 10, 2012) (quoting Walker v. Jon Renau Collection, Inc., 423 F. Supp. 2d 115, 117 (S.D.N.Y. 2005)). Section 1404(a) affords a court "considerable discretion . . . to adjudicate motions for transfer according to an 'individualized, case-by-case consideration of convenience and fairness.'" Kreinberg v. Dow Chem. Co., 496 F. Supp. 2d 329, 330 (S.D.N.Y. 2007) (quoting Red Bull Assoc. v. Best Western Int'l, Inc., 862 F.2d 963, 967 (2d Cir. 1988)). Nevertheless, the moving party must demonstrate by "clear and convincing evidence" that transfer is appropriate. Rosen v. Ritz-Carlton Hotel Co., No. 14-cv-1385 (RJS), 2015 WL 64736, at *1 (S.D.N.Y. Jan. 5, 2015) (citing CYI, Inc. v. Ja-Ru, Inc., 913 F. Supp. 2d 16, 18 (S.D.N.Y. 2012)).

B.     Propriety of Transferee District

At the outset, the Court must determine "whether the action is one that might have been brought in the district to which transfer is sought." Izhakov, 2012 WL 2861338, at *3 (citing Herbert Ltd. P'ship v. Elec. Arts, Inc., 325 F. Supp. 2d 282, 285 (S.D.N.Y. 2004)). Schiller does not dispute that the Southern District of Florida would

5

have personal and subject matter jurisdiction over the Defendants.  Schiller does,

however, contest whether venue there would be proper.

> Venue in a civil action is proper in:
>
> (1) a judicial district in which any defendant resides, if all
> defendants are residents of the State in which the district is
> located; (2) a judicial district in which a substantial part of the
> events or omissions giving rise to the claim occurred, or a
> substantial part of property that is the subject of the action is
> situated; or (3) if there is no district in which an action may
> otherwise be brought as provided in this section, any judicial
> district in which any defendant is subject to the court's
> personal jurisdiction with respect to such action.

28 U.S.C. §§ 1391(b)(1)-(3).  Since the Defendants reside in multiple states, both sides

agree that venue in this case is proper in any "judicial district in which a substantial part

of the events or omissions giving rise to the claim occurred."  28 U.S.C. §§ 1391(b)(2).

To contest that venue is proper in the Southern District of Florida, Schiller

contends that the tortious conduct underlying his defamation and violation of privacy

claims is limited to the (1) drafting of the Film's screenplay and creative development of

the defamatory portrayal of him; (2) post-production and editing decisions that

characterize the Film as a "true story;" (3) marketing of the Film as a "true story;" and (4)

decision to use (and subsequent actual use of) Schiller's likeness for financial gain

without proper authorization.  (Pl.'s Opp. at 4-6).  Based on this narrow interpretation of

his claims, Schiller concludes that venue in the Southern District of Florida would be

improper because none of this relevant conduct took place there.  (Id. at 6).

Schiller's crabbed reading of his complaint is based on an unrealistic view of the facts he himself has alleged. Although the conduct he identifies certainly played a role in giving rise to his claims, it defies reason to suggest that the actual filming of the purportedly defamatory and unauthorized portrayal is not a critical underlying act. Thus, notwithstanding Schiller's assertion that "the actual shooting of the film was not an event which gave rise to [his] claims," even he is forced to concede that the decision to describe and advertise the Film as a "true story" and the "ultimate publishing/distribution of the Film . . . across the country" are significant components of his claim. (Id. at 5). Accordingly, without the forty-two days of filming that took place in the Southern District of Florida, this lawsuit never would have been filed. See A Slice of Pie Prods., LLC v. Wayans Bros. Entm't, 392 F. Supp. 2d 297, 306 (D. Conn. 2005) (both the locations where a screenplay was created and where the allegedly infringing film was produced are relevant in deciding a motion to transfer a copyright infringement suit because "[w]ithout either . . . th[e] claim would not exist."). It follows that venue in that District is proper.

Davis v. Costa-Gavras, 580 F. Supp. 1082 (S.D.N.Y. 1984), upon which Schiller relies, does not dictate an alternative outcome. In Davis, the court addressed the proper venue for a libel suit brought by government officials against individuals associated with the publication of two books and a movie that they alleged falsely accused them of being involved in the 1973 military coup that overthrew the government of Chilean President Salvador Allende. The court reasoned that the Southern District of

New York was the only appropriate venue for the plaintiffs' claims because "the vast majority of the acts giving rise to liability" occurred there, including the researching and writing of one of the defamatory publications, the negotiation of multiple contracts, and editing and promotional planning.  Id. at 1090.  Here, Schiller cannot seriously contend that the vast majority of events giving rise to liability occurred in the Southern District of New York.  In fact, Schiller has not pointed to <u>any</u> acts giving rise to liability that occurred exclusively in the Southern District of New York.

       In sum, although the acts potentially giving rise to liability occurred in multiple districts, enough key events occurred in the Southern District of Florida to make venue there proper.  <u>See</u> <u>Greenblatt v. Gluck</u>, 265 F. Supp. 2d 346, 352 (S.D.N.Y. 2003) ("[I]t is sufficient that a substantial part of the events occurred in the challenged venue, even if a greater part of the events occurred elsewhere.").  Therefore, contrary to Schiller's assertion, this action could have been brought in the Southern District of Florida.

    C.    <u>Transfer Factors Under Section 1404(a)</u>

      1.    <u>Locus of Operative Events</u>

       "The location of a lawsuit's operative events is . . . a 'primary factor' in determining a motion to transfer venue."  <u>Tole v. Glenn Miller Prods., Inc.</u>, No. 12 Civ. 6660 (NRB), 2013 WL 4006134, at *4 (S.D.N.Y. Aug. 6, 2013) (citing Schoenfeld v. New York, No. 08 Civ. 3269 (NRB), 2009 WL 1069159, at *2 (S.D.N.Y. Apr. 16, 2009)).  In this case, given the parties' stark disagreement with respect to this factor and

the importance of resolving that disagreement, determining the locus of operative events

giving rise to Schiller's claims is an appropriate point to start.

   The Defendants contend that the Southern District of Florida is the locus of

operative events because:  (a) the events depicted in the Film occurred there; (b) Schiller

lived and worked there during the time period depicted in the Film; (c) Schiller currently

lives and works there and consequently enjoys his reputation there; (d) the Film was

based on an article published there; and (e) the Film was shot there.  (Defs.' Mem. at 18).

In response, Schiller essentially repeats his venue argument, contending that the only

relevant operative events are those that immediately surround the development of the

defamatory screenplay and the decisions to promote the Film as a "true story" and to use

his likeness without authorization in connection with the Film and the cross-promotional

campaign with GNC, each of which unquestionably took place outside the Southern

District of Florida.  (Pl.'s Opp. at 13-16; see Defs.' Mem. at 18).

   The argument is no more availing here.  Although the development of the

screenplay may have been the starting point for the defamatory and unauthorized

portrayal of Schiller, it certainly was not the end point.  The filming of the allegedly

defamatory portrayal obviously provides a significant connection to the Southern District

of Florida.  Moreover, the subject matter of the Film also furnishes such a nexus.

Specifically, the Film was based on an article, published in the Miami Sun Times, which

described events occurring in the Southern District of Florida that involved individuals

who lived and worked in the Southern District of Florida.  See Boehner v. Heise, 410 F.

Supp. 2d 228, 240-41 (S.D.N.Y. 2006) (location of subject matter of defamatory publication probative of proper venue).  In other words, to the extent Schiller must prove that the depiction of him in the Film is inaccurate, the "truth" has its roots in the Southern District of Florida.

Equally problematic for Schiller is that, even if the Court were to adopt his narrow view of the operative events, there is no relationship between those events and the Southern District of New York.  Indeed, Schiller is able to present only conclusory allegations to support the notion that any relevant events transpired in the Southern District of New York.  (See e.g., Pl.'s Opp. at 14 ("This post-production work was done in New York and/or California."), id. at 15 ("The Defendants' decision to knowingly change and fictionalize Plaintiff's depiction in the film was made in New York and/or California."), id. ("The decision to use Plaintiff's image, portrait or likeness without his consent was also made in New York and/or California."), id. ("The decision to promote and label the Film as a "TRUE STORY" was also made in New York and/or California.")).  Those conclusory assertions, however, are contracted by the sworn statements of the Defendants, who obviously are in the best position to know where key events took place.  (See Bertelle Decl. ¶ 6-7, Markus Decl. ¶¶ 3,7, McFeely Decl. ¶ 3, 7, Moore Decl. ¶¶ 5-8).

Schiller's conclusion that New York is the locus of the operative facts in this case apparently is based on the belief that Paramount and Paramount Home, in addition to Viacom, actually have their "principal executive offices" in New York, and

not, as the Defendants contend, in California.  (See Pl.'s Opp. at 1, 10, 19-20; Ronai Decl. ¶ 6).  In support of this assertion, Schiller has furnished documents from the New York and California Departments of State which identify Paramount's and Paramount Home's principal executive office as "1515 Broadway, New York, New York 10036."  (Ronai Decl. Ex. A).  The Defendants do not dispute that Viacom, Paramount's corporate parent, is headquartered in New York, although they do deny any involvement by Viacom in the events underlying Schiller's claims.  (See Bertelle Decl. ¶ 4).  The Defendants nevertheless contend that Paramount's principal executive office, the Paramount Pictures Studio, is located in Los Angeles, as reflected in Paramount's most recent annual report filed with the California Secretary of State.  (Magid Decl. ¶¶ 3-5; id. Exs. A, B).  Further, the Defendants explain that Viacom's New York address is listed as Paramount's principal executive office on the documents submitted by Schiller because Viacom handles "corporate housekeeping for its domestic subsidiaries."  (Id. ¶ 6).  Moreover, several other courts have recently determined that both Paramount and Paramount Home have their primary places of business in California.  See, e.g., FastVDO LLC v. Paramount Pictures Corp., 947 F. Supp. 2d 460, 461 (D. Del. 2013) (noting that Paramount and Paramount Home are Delaware corporations with their "principal place of business located at 5555 Melrose Avenue, Los Angeles, California."); NISSM Corp. v. Time Warner, Inc., No. 07-20624 CIV, 2008 WL 540758, at *1 (S.D. Fla. Feb. 25, 2008) (noting that Paramount Home is "located in Los Angeles County, in the Central District of California").  In light of these facts, the filings with the two departments of State

11

hardly constitute persuasive proof that Paramount and Paramount Home are headquartered in New York.  More importantly, even if Paramount and Paramount Home were shown to have their principal executive offices in New York, that fact alone would not contradict the sworn declarations of the Defendants indicating that all of the operative events surrounding the Film and the GNC cross-promotional campaign occurred outside of New York.

      In sum, while the Southern District of Florida may not be the exclusive locus of operative events since many such events also occurred in the Central District of California, it is one of those districts – not New York – that has a "meaningful connection to the underlying facts."  GlaxoSmith Kline Biologicals, S.A. v. Hospira Worldwide, Inc., No. 13 Civ. 1395 (PKC), 2013 WL 2244315, at *3 (S.D.N.Y. May 21, 2013).  Accordingly, this factor weights heavily in favor of transfer.

      2.     Convenience of Witnesses and Availability of Process
           to Compel Their Appearance

      The convenience of the party and nonparty witnesses is "typically the most important factor on a motion to transfer."  GlaxoSmithKline Biologicals, 2013 WL 2244315, at *4 (quoting AGCS Marine Ins. Co. v. Associated Gas & Oil Co., 775 F. Supp. 2d 640, 647 (S.D.N.Y. 2011)).  This factor does not involve simply totaling the number of potential witnesses available in each jurisdiction; rather, it requires the Court to determine whose testimony is likely to be relevant and material and the ability of each court to compel their appearance there for trial.  Id.  "In order to show that this factor

favors transfer, the moving party must identify the witnesses located in the transferee district upon whom it intends to rely and describe the content of their potential testimony."  In re Collins & Aikman Corp. Sec. Litig., 438 F. Supp. 2d 392, 395 (S.D.N.Y. 2006) (citing Colour & Design v. U.S. Vinyl Mfg. Corp., No. 04 Civ. 8332 (MBM), 2005 WL 1337864, at *4 (S.D.N.Y. June 3, 2005)).  Accordingly, "vague generalizations" about who the key witnesses are and the likely content of their testimony are insufficient to warrant a transfer of venue.  Id. (quoting Orb Factory, Ltd. v. Design Science Toys, Ltd., 6 F. Supp. 2d 2013, 208-09 (S.D.N.Y. 1998)).

In this case, the finder of fact will have to determine whether the portrayal of Schiller in the Film was false and harmful to his reputation, and whether his likeness was used in an unauthorized manner.  As a consequence, the key witnesses are likely to be individuals who can testify about the manner in which the screenplay was developed, the creative and administrative decision-making during production and promotion of the Film, and the truth or falsity of the portrayal of Schiller in the Film.  Many of these witnesses do not reside in either the Southern District of Florida or the Southern District of New York.  Their convenience therefore does not tip the scales either way.  See Tole, 2013 WL 4006134, at *3 ("[T]he Court dismisses from consideration the convenience of witnesses who are located outside both the current and transferee forums.") (quoting Wechsler v. Macke Int'l Trade, Inc., No. 99 Civ. 5725, 1999 WL 1261251, at *6 (S.D.N.Y. Dec. 27, 1999)).

Nevertheless, the Defendants have identified several witnesses who reside in or around the Southern District of Florida, who would either be inconvenienced by having to travel to the Southern District of New York, or who could not be compelled to testify in the Southern District of New York.  These witnesses include Collins, the author of the Article who served as a consultant for the Film, and four other individuals who allegedly knew Schiller during the time period depicted in the Film and who would be able to testify as to his "conduct, activities and character" during that time.  (See Defs.' Mem. at 14; see Cox Decl. ¶¶ 9-10; McKenna Decl. ¶¶ 3-8).

Despite this proffer, the Defendants' showing regarding the potentially inconvenienced witnesses and the scope of their testimony is not without its problems. For example, the Defendants say that they hope to establish, in part through the testimony of these witnesses, that Schiller engaged in – and eventually pleaded guilty to – Medicare fraud.  (See Cox Decl. ¶¶ 6-13).  To the extent Schiller's criminal history is relevant to assessing his reputation and the damage it may have suffered due to the release of the Film, the Defendants presumably will be able to introduce the fact of Schiller's conviction.  However, it is far from clear that the details of his crime would be received.

Additionally, it is unclear from the Defendants' submissions how well the four witnesses that they identify knew Schiller, whether they are in a position to testify as to the truth or falsity of the allegedly defamatory aspects of the Film's portrayal of him, and even whether they still reside in South Florida and are willing to testify.  (See McKenna Decl. ¶¶ 4-8); see also Rosen, 2015 WL 64736, at *4 ("Even if a party's

14

witnesses are beyond the subpoena power of the Court, if neither party asserts that a witness will be unwilling to testify voluntarily, the availability of process to compel testimony is irrelevant to the transfer analysis.").  Indeed, the Defendants' private investigator was able to locate and speak to only one of these individuals.  (McKenna Decl. ¶ 5).  For the remaining three, the investigator was able to confirm, with varying degrees of certainty, only that they currently reside in South Florida.  (Id. ¶¶ 6-8).

Nevertheless, it does not require too great a leap of faith to conclude that individuals with relevant and material testimony regarding the allegedly defamatory portrayal of Schiller in the early 1990s are more likely to reside in the Southern District of Florida – where events giving rise to the Film took place – than in the Southern District of New York.  See Kreinberg v. Dow Chem. Co., 496 F. Supp. 2d 329, 331 (S.D.N.Y. 2007) ("Because most of the relevant events took place in Michigan, it is likely that most of the witnesses and documents are located there.").  Furthermore, the fact that the Defendants had difficulty tracking down even those few witnesses of whom they were aware, lends credence to their claim that venue should be transferred to a jurisdiction more likely to have subpoena power over such individuals.  Moreover, because the focus of the trial will be whether the depiction of Schiller in the Film was accurate, it is imperative that individuals who knew and worked with Schiller during the time period portrayed be available to testify.  For that reason, the testimony of the potential witnesses identified by the Defendants, may prove significant.

On the other hand, Schiller identifies a number of "family and life-long friends" residing in or around the Southern District of New York, who allegedly will serve as character and damages witnesses and who would be inconvenienced by a transfer of venue.  (See Pl.'s Opp. at 9-10; Schiller Decl. ¶ 8).  Although it is plausible that at least some of those witnesses would be able to provide non-cumulative testimony regarding the damage to Schiller's reputation, it is unclear to what extent each has relevant testimony to offer.  Indeed, he has not furnished any sworn statements from any of these witnesses. See Izkhakov, 2012 WL 2861338, at *4 ("Although Plaintiff lists the names of several family members residing in this District, she does not specify who would testify about what or how many witnesses would be needed to provide non-cumulative testimony regarding Plaintiff's character or damages.").  Moreover, although Schiller asserts that they will be able to testify that Schiller "was not as depicted in the . . . Film," (Pl.'s Opp. at 9), he has not established that there would be a factual basis for their testimony. Specifically, to the extent the Amended Complaint alleges that certain of the Film's assertions were untrue and defamatory, it is unclear how family members who never have lived in South Florida during the time period portrayed in the Film could testify on personal knowledge about the alleged inaccuracies.  Nevertheless, at least some of this testimony might be appropriate – at least to determine damages – and the need to produce these witnesses in the Southern District of Florida obviously would be burdensome to Schiller.

In sum, in light of the potential burden that Schiller's character and damages witnesses may face, as well as the uncertainty surrounding the Defendants' proposed witnesses and their testimony, this factor weighs slightly in favor of transfer. See Price, 2008 WL 2434137, at *6 ("Given [the defendants'] weak preliminary showing of potential subpoena difficulties, in conjunction with the absence of any contrary showing by [the plaintiff], this factor weighs slightly in favor of transfer.").

     3.    <u>Convenience of the Parties and Their Relative Financial Means</u>

This is the rare case where each side is seeking to litigate this case in a foreign jurisdiction. Even stranger, Schiller, who describes himself as a "W2 employee" who "merely eeks [sic] out a living," (Pl.'s Opp. at 17), is opposing a transfer to his home forum. Nevertheless, the Defendants, none of whom reside in the Southern District of Florida, and only one of whom is definitively headquartered in the Southern District of New York, would be inconvenienced equally whether the case is litigated in New York or Florida.

Schiller, on the other hand, would himself certainly be less inconvenienced by litigating this case in his home district. See Price, 2008 WL 2434137, at *4 ("[Plaintiff] is a California resident and thus cannot claim that this District is the more convenient forum for him, despite his assertion that he 'visits New York often.'") (parenthetical omitted). Schiller notes, however, that he would have the burden of having to fly his character and damages witnesses from New York to Florida. (Pl.'s Opp. at 11). To the extent that at least some of Schiller's family members and "life-long" friends

would be able to provide relevant non-cumulative testimony, Schiller might in fact have to bear that not insignificant cost.  Additionally, that burden obviously looms larger for Schiller, who is an individual of limited means.  See Price, 2008 WL 2434137, at *6.  On the other hand, any inconvenience that Schiller may suffer is offset by his ability to litigate this case on his "home turf."  Accordingly this factor is neutral.

### 4.   Location of Relevant Documents

"The location of relevant documents is largely a neutral factor in today's world of faxing, scanning, and emailing documents."  Flood v. Carlson Restaurants Inc., No. 14 Civ. 2740 (AT), 2015 WL 1396257, at *4 (S.D.N.Y. Mar. 27, 2015) (quoting Am. S.S. Owners Mut. Prot. & Indem. Ass'n, Inc. v. Lafarge N. Am., Inc., 474 F. Supp. 2d 474, 484 (S.D.N.Y. 2007)).  Therefore, absent a "detailed showing as to the burden [the Defendants] would incur absent a transfer," this factor is entitled to "little weight."  Intria Corp. v. Intira Corp., No. 00 CIV. 7198 (AGS), 2000 WL 1745043, at *4 (S.D.N.Y. Nov. 27, 2000).  There are few, if any, documents relevant to proving or disproving Schiller's claims in either the Southern District of New York or the Southern District of Florida. (See McFeely Decl. ¶ 7; Markus Decl. ¶ 7; Bertelle Decl. ¶ 7; Moore Decl. ¶ 6; Pacacha Decl. ¶ 6).  Accordingly, because the Defendants have failed to demonstrate any hardship that would be incurred in relation to this factor, it does not weigh in favor of transfer.

### 5.   Familiarity with the Applicable Law

"A federal court sitting in diversity is more likely to be aware of the subtleties of state law in the state in which it sits."  Hamilton v. AccuTek, 47 F. Supp. 2d

330, 347 (E.D.N.Y. 1999).  "However, this factor is 'generally given little weight in federal courts' because federal courts are deemed capable of applying the substantive law of other states."  Tole, 2013 WL 4006134, at *5 (quoting AEC One Stop Grp., Inc. v. CD Listening Bar, Inc., 326 F. Supp. 2d 525, 531 (S.D.N.Y. 2004)).  This is particularly true when "an action does not involve complex questions or another state's laws."  Citibank, N.A. v. Affinity Processing Corp., 248 F. Supp. 172, 178 (E.D.N.Y. 2003); see Tole, 2013 WL 4006134, at *5 ("[T]here is nothing to indicate that a federal court in Florida is incapable of applying New York state law to the instant dispute.").

Although the parties disagree as to whether New York or Florida law should govern Schiller's claims, (Defs.' Mem. at 20-21; Pl.'s Opp. at 18-22), a federal court sitting in either forum would unquestionably be able to apply both New York and Florida law effectively in this case.  See Excellent Home Care Servs., LLC v. FGA, Inc., No. 13 Civ. 05390 (ILG) (CLP), 2014 WL 652357, at *5 (E.D.N.Y. Feb. 19, 2014) ("In any event, regardless of which state's laws apply, both this Court and the District of New Jersey would no doubt ably apply the law to [the plaintiff's] straightforward claims."); Rosen, 2015 WL 64736, at *5 ("[A]lthough Plaintiffs' negligence and negligent infliction of emotional distress claims are premised on state law, they are common causes of action such that courts in Puerto Rico do not have a significant familiarity advantage over this Court.").  Accordingly, this factor does not weigh against transfer.

6.     Schiller's Choice of Forum

Generally, "[t]he plaintiff's choice of forum is . . . accorded significant weight in the transfer analysis." Izkhakov, 2012 WL 2861338, at * 4. Under certain circumstances, however, "this weight is 'significantly diminished.'" Id. (quoting Royal Ins. Co. of Am. v. United States, 167 F. Supp. 2d 573, 576 (S.D.N.Y. 2001)). The circumstances warranting less deference include those in which (a) "the operative facts have no connection to the chosen district;" or (b) the "plaintiff chooses a forum other than her place of residence." Id.; City of Pontiac Gen. Employees' Ret. Sys. v. Stryker Corp., No. 10 Civ. 376 (RWS), 2010 WL 2035130, at *3 (S.D.N.Y. May 21, 2010) (collecting cases).

As noted previously, the operative events underlying Schiller's claims have virtually no unique connection to the Southern District of New York. Moreover, Schiller is a resident of Florida, not New York. Both of these factors serve to diminish significantly the weight that would otherwise be accorded to Schiller's choice of forum. Even if the Court were to assume that Schiller's reasons for seeking to litigate this case in New York – such as proximity to family, friends, and counsel – are "legitimate and not tactical," (Pl.'s Opp. at 23), they are not sufficient to bestow upon Schiller's choice of forum the significant weight he suggests. See Izhakov, 2012 WL 2861338, at *4-5 (Despite plaintiff's family's residence in the Southern District of New York, when "the operative facts have no connection to [this District] . . . Plaintiff's choice of adjudicating her claim [here] 'should not receive the level of deference normally accorded to a

plaintiff's choice of forum.'"); see also Tole, 2013 WL 4006134, at *5 ("While plaintiff appears to have selected New York in part because it is home to his counsel, the convenience of counsel is not relevant to the decision of whether to transfer venue.").[4]

Finally, Schiller suggests that his choice of forum should be given deference in light of the Defendants' attempt to forum shop for a tactical advantage. (Pl.'s Opp. at 23). Specifically, Schiller suggests that the Defendants believe that the Southern District of Florida would be a "friendlier" venue because of South Florida's recent efforts to become the new "Hollywood" by luring movie studio dollars away from New York and California. (Id. at 1-2). This conclusory assertion verges on the absurd. Moreover, even if the Defendants' motivation were to find a sympathetic forum, it would seem to be imprudent for them to seek a transfer to Schiller's home state from what is obviously one of the two leading movie-making hubs in the United States. Much more likely as a motivating factor is South Florida's significant connection to this lawsuit, and the Defendants' desire to proceed in a forum with subpoena authority over potentially reluctant witnesses.

Accordingly, for these reasons, Schiller's choice of forum is not entitled to any deference.

---

[4]    Schiller also contends that his choice of forum should be given deference because of the Defendants' ongoing business activity in the Southern District of New York. (Pl.'s Opp. at 23-24). The case law that Schiller cites suggests that "slight deference" is due to a plaintiff's choice of forum when his own business activities take place in that forum or the defendants' activities implicated by the lawsuit take place there  See It's a 10, Inc. v. PH Beauty Labs, Inc., 718 F. Supp. 2d 332, 335-36 (S.D.N.Y. 2010); Kiss My Face Corp. v. Bunting, No. 02 CIV 2645 (RCC), 2003 WL 22244587, at *4 (S.D.N.Y. Sept. 30, 2003). Here, however, neither is true.

7.      <u>Judicial Economy and the Interests of Justice</u>

Courts are wary of transferring a case when it would undermine judicial

economy by requiring a different court "to familiarize itself with the facts of [a] case."

Rosen, 2015 WL 64736, at *5.  As in <u>Rosen</u>, this concern is not compelling because this

case is at a very preliminary stage and the only matter that the Court has had to consider

is this motion to transfer.  Moreover, the median time for a case to move from filing to

disposition in the Southern District of Florida is far less than in this District (4.6 months

vs. 8.1 months).  See Federal Judicial Caseload Statistics 2013 Tables,

http://www.uscourts.gov/statistics-reports/federal-judicial-caseload-statistics-2013-table.

Therefore, "it would not materially delay resolution of the case" to grant the Defendants'

motion to transfer.  Rosen, 2015 WL 64736, at *5.

A motion to transfer under 28 U.S.C. § 1404(a) is addressed to the Court's

discretion and must be resolved on a case-by-case basis.  <u>Berman v. Informix Corp.</u>, 30 F.

Supp. 2d 653, 656 (S.D.N.Y. 1998).  In this case, each of the factors in the Section

1404(a) inquiry either augurs in favor of transfer or is neutral.  Accordingly, when all of

the relevant factors are considered, it is apparent that the Defendants have demonstrated

by clear and convincing evidence that the interest of justice would best be served by a

transfer to the Southern District of New York.

III.   <u>Conclusion</u>

        For the foregoing reasons, the Defendants' motion to transfer this action to

the Southern District of Florida, (ECF No. 62), is granted.

        SO ORDERED.

Dated:      New York, New York
           May 28, 2015

                                              FRANK MAAS
                              United States Magistrate Judge

Copies to All Counsel via ECF

23